FILED

November 17 2015

*Ed Smith*
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 14-0780

DA 14-0780

IN THE SUPREME COURT OF THE STATE OF MONTANA

2015 MT 323

LETICA LAND COMPANY, LLC,
a Michigan limited liability company,
and DON MCGEE, an individual,

        Plaintiffs and Appellants,

    v.

ANACONDA-DEER LODGE COUNTY,
a political subdivision of the State of Montana,

        Defendant and Appellee.

APPEAL FROM:    District Court of the Third Judicial District,
In and For the County of Anaconda-Deer Lodge, Cause No. DV 12-24
Honorable Kurt Krueger, Presiding Judge

COUNSEL OF RECORD:

        For Appellants:

            Martin S. King (argued), Jesse Kodadek, Worden Thane P.C., Missoula, Montana (for Letica Land Company, LLC)

            Mark L. Stermitz (argued), Jeffrey R. Kuchel, Crowley Fleck PLLP, Missoula, Montana (for Don McGee)

        For Appellee:

            Cynthia L. Walker (argued), Mark A. Thieszen, Poore, Roth & Robinson, P.C., Butte, Montana

Argued and Submitted: September 16, 2015
Decided: November 17, 2015

Filed:

_____
Clerk

Justice Beth Baker delivered the Opinion of the Court.

¶1 Letica Land Company, LLC, (Letica) and Don McGee appeal the judgment of the Third Judicial District Court that two roads crossing Letica's and McGee's properties in Anaconda-Deer Lodge County are public roads. Letica and McGee raise several issues on appeal that we restate as follows:

*1. Whether the District Court erred in concluding that the record, taken as a whole, established that Anaconda-Deer Lodge County statutorily created Modesty Creek Road's lower branch terminating in Section 22, Township 6 North, Range 11 West;*

*2. Whether the District Court erred in concluding that the public holds a prescriptive easement across Modesty Creek Road's upper branch.*

¶2 We affirm on Issue 1, reverse on Issue 2, and remand for further proceedings.

## PROCEDURAL AND FACTUAL BACKGROUND

¶3 The disputed portions of Modesty Creek Road[1] pass through properties owned by Letica and McGee. The road includes an upper and lower branch and is located near the boundary between Anaconda-Deer Lodge County (County) and Powell County in the Flint Creek Range foothills approximately ten miles north of Anaconda, Montana.

¶4 Modesty Creek Road's lower branch begins at an intersection with Spring Gulch Road—an undisputed county road—in Section 19, Township 6 North, Range 10 West. There is an orange gate on the lower branch at that branch's intersection with Spring Gulch Road. The road travels northwest through McGee's property along Modesty Creek's north side and exits the property in Section 24, Township 6 North, Range 11

---

[1] There is dispute regarding the road's name and whether it is even a road in places; however, both parties refer to the road as "Modesty Creek Road" in their briefing and we will do the same.

2

West. There is a green gate where the road exits McGee's property and enters Letica's property. The road passes a short distance over Letica's property before entering what the parties refer to as the Launderville parcel—an inholding surrounded entirely by Letica's property and now owned by nonparties Thomas and Patricia Donich. The District Court concluded that the lower branch reenters Letica's property in Section 23, Township 6 North, Range 11 West, and continues west before ending in the eastern portion of Section 22, Township 6 North, Range 11 West.

¶5 The upper branch splits from the lower branch near the western Launderville/Letica property boundary in Section 23, Township 6 North, Range 11 West. The upper branch travels west/northwest across Letica's property through Sections 23, 22, and 15, Township 6 North, Range 11 West. The road enters Powell County in Section 15. It continues into the Beaverhead-Deerlodge National Forest where it becomes a United States Forest Service road that accesses a number of lakes.[2]



---

[2] The map shown is not included in the record, but it represents an approximate location of the two disputed branches of Modesty Creek Road as they pass through the various properties according to maps and exhibits contained in the record.

¶6    In March 1889, the Deer Lodge County Commission[3] considered a petition to establish Modesty Creek Road as a county road. The minutes from the meeting describe the petition as follows:

> Upon the petition of John N. Nelson, et al. and proof of the posting of notices as required by law having been filed with the Clerk, Frank Stephens, Geo Jacques and Joseph Marshall were appointed viewers to meet April 11, 1889 to view out, locate and report upon the following road to wit.

> Beginning at the S.E. Cor[ner] of Sec[tion] 22, T9NR10W,[4] Deer Lodge Co. MT and running thence due west two miles along the section lines. Thence up Modesty Creek along the old road as near as practicable to the mouth of Dry Gulch.

Deer Lodge County Commissioners Records, *Deer Lodge County Commission Meeting Minutes, March 21, 1889*, Book 6, 373. The Commission met again in June 1889 and the minutes from that meeting contain the following declaration regarding Modesty Creek Road:

> Report of Frank Stephens, Joseph Marshall, and Geo Jacques – viewers appointed on March 21st and 1889 to view out, locate and report upon a road petitioned for by John N. Nelson, et al. met and accepted and the same is hereby accepted declared a public highway with the provision that all parties interested or benefited by said road bear all expense connected with the opening and building of the same.

Deer Lodge County Commissioners Records, *Deer Lodge County Commission Meeting Minutes, June 3, 1889*, Book 6, 396. An 1896 County road map shows Modesty Creek Road's lower branch generally following the route described above and ending near a

---

[3] Anaconda-Deer Lodge County was formerly known as Deer Lodge County.
[4] At trial, the parties agreed that "T**9**NR10W" was a scrivener's error and should read "T**6**NR10W."

4

gulch labeled "Dry Gulch" in an "unsurveyed" portion of Township 6 North, Range 11 West.

¶7     The road traversed only federal public land until the federal government conveyed the land to the Anaconda Company in 1937. During the Anaconda Company's ownership, testimony at trial indicated that the public regularly accessed both branches of Modesty Creek Road. In 1965, the Anaconda Company sold the land. A number of private interests have owned various parcels ever since. Testimony at trial indicated that the public continued to regularly access both branches until the early 1980s. Ilija Letica purchased the property in 1989 and transferred the property to Letica in 1997. McGee also purchased his property in 1997.

¶8     In the mid-1960s, the Launderville parcel's prior owner, Joe Launderville, fenced the parcel and placed a gate across the upper branch. Launderville testified at trial that he locked the gate sporadically in the early 1980s. At around the same time, Letica's and McGee's predecessors in interest installed and locked the orange and green gates across the lower branch. In the mid-1980s, Shawn DeMers, an area landowner, removed a culvert at the orange gate at Launderville's request. The culvert allowed road users to cross Modesty Creek. The locked gates on the lower branch and the culvert's removal restricted public use of both branches. As such, both Letica and McGee maintain that they were unaware of any claim of public right of access over either branch of Modesty Creek Road at the time they purchased their respective properties.

¶9     Following a confrontation with Ilija Letica, DeMers and another County resident asked the County Commission in early 2012 to reaffirm both branches of Modesty Creek

5

Road as county roads and reopen them to the public. The County Commission retained an attorney to research the road's history and, on March 6, 2012, voted to reaffirm both branches as county roads based in part on her opinion and supporting documentation. Two days later, Letica filed a complaint for declaratory and injunctive relief. Following a hearing, the District Court issued an order in July 2012 denying Letica's request for a preliminary injunction to close Modesty Creek Road.[5] McGee joined as a plaintiff in an amended complaint.

¶10 Prior to trial, the County initially contended that both branches of Modesty Creek Road were statutorily created. After discovery closed, however, the County located a road record book that established that the upper branch was not in fact a statutorily created road. The County thereafter asserted that a public prescriptive easement established the upper branch as a public road.

¶11 In a December 2013 order, the District Court denied the parties' motions for partial summary judgment. The court also denied Letica's and McGee's motion to alter or amend the July 2012 order to allow gates to be placed on the upper branch based on the newly-discovered evidence that the upper branch was not a statutorily created road. The court did, however, allow Letica and McGee to amend their complaint to add a

---

[5] The court found it unnecessary to address whether a public prescriptive easement was created on Modesty Creek Road in its July 2012 order denying a preliminary junction. The court, however, did observe that "the public's acquiescence of locked gates placed across Modesty Creek Road for more than 30 years likely extinguished any public prescriptive easement, if one ever existed." In a December 2013 order, the court held that sufficient facts remained at issue for the County's prescriptive easement claim to proceed to trial.

constitutional takings claim based on the same evidence regarding the upper branch. The court then bifurcated the takings claims from the public right-of-way claims *sua sponte*.

¶12    The court commenced a five-day bench trial on May 12, 2014. The parties presented extensive evidence regarding whether the County created the lower branch by petition and whether there is a public prescriptive easement on the upper branch. The evidence included: the 1889 Commission meeting minutes quoted above; 1896 Commission meeting minutes; various maps that either show or do not show Modesty Creek Road; lay witness testimony concerning the County's level of exercise of jurisdiction over the road; lay witness testimony regarding the road's use by the public; testimony from Letica's and McGee's expert, Ken Jenkins, a licensed surveyor; historical documents relating to mining activity in the area; and a site visit with the court, counsel, and representatives for each party. Following the trial, the District Court issued a thorough 74-page findings of fact, conclusions of law, and order in October 2014.[6] The court concluded that Modesty Creek Road's lower branch was a statutorily created road ending along the eastern edge of Section 22, Township 6 North, Range 11 West. The court also concluded that a public prescriptive easement established Modesty Creek Road's upper branch as a public road and that the prescriptive easement had not been extinguished by reverse adverse possession. The court entered its order as a final judgment; in mid-November 2014, the court issued an order awarding costs and finding that "the takings issue is not ripe for ruling or further hearing until after the appeal is heard." Letica and McGee appeal.

---

[6] We would like to acknowledge that the District Court's order meticulously cited to the record.

## STANDARD OF REVIEW

¶13 We review a district court's findings of fact to determine if they are clearly erroneous. M. R. Civ. P. 52(a)(6); *Galassi v. Lincoln Cnty. Bd. of Comm'rs*, 2003 MT 319, ¶ 7, 318 Mont. 288, 80 P.3d 84 (citation omitted). A finding is clearly erroneous if it is not supported by substantial evidence, if the district court misapprehended the effect of the evidence, or if our review of the record convinces us that the district court made a mistake. *Galassi*, ¶ 7 (citations omitted). We review a district court's conclusions of law to determine if they are correct. *Galassi*, ¶ 7 (citation omitted).

## DISCUSSION

¶14 *1. Whether the District Court erred in concluding that the record, taken as a whole, established that the County statutorily created Modesty Creek Road's lower branch terminating in Section 22, Township 6 North, Range 11 West.*

¶15 In 1889, the statutory procedures for establishing a county road required, in part: residents to submit a petition regarding the proposed road to the board of county commissioners; the posting of public notice of the petition; the board to appoint road viewers to mark out the road and report back to the board; and the board to approve or reject the road viewers' report and provide notice of the road's opening. Compiled Statutes of Mont., 5th Div. Gen. Laws §§ 1809-1818 (1887); *Oates v. Knutson*, 182 Mont. 195, 199, 595 P.2d 1181, 1183 (1979) (summarizing the 1887 statutory procedures for establishing a county road). The standard for determining the existence of a public road, however, is not proof of strict adherence to these statutory procedures; rather, it is whether "the record taken as a whole shows that a public road was created." *Reid v. Park Cnty.*, 192 Mont. 231, 236, 627 P.2d 1210, 1213 (1981). We adopted the "record taken

8

as a whole" standard in *Reid* because "strict compliance with the jurisdictional requirements to establish a road by petition would pose an unjustifiable burden on the public to prove a public road created nearly 100 years earlier." *Sayers v. Chouteau Cnty.*, 2013 MT 45, ¶ 26, 369 Mont. 98, 297 P.3d 312 (citing *Reid*, 192 Mont. at 234, 627 P.2d at 1212).

¶16    As an initial matter, Letica and McGee contend that "[u]nder the circumstances of this case . . . the 'finding' that a county road exists is actually the declaration of a significant legal right that implicates [Letica's and McGee's] fundamental and constitutionally protected property interests." Accordingly, they assert that the determination whether Modesty Creek Road is a public road is a conclusion of law that must be reviewed for correctness. Although we have not addressed this issue directly, we have concluded that under the "record taken as a whole" standard, there must be "substantial credible evidence" to support a district court's determination that a road is public. *Jefferson Cnty. v. McCauley Ranches, Ltd. Liab. P'ship*, 1999 MT 333, ¶ 35, 297 Mont. 392, 994 P.2d 11 (holding that "substantial credible evidence supported the District Court's determination that McCarty Creek Road is a county road"); *Galassi*, ¶ 16 (concluding "that there was substantial evidence presented to the District Court to support its finding that RP 81 is a public roadway"). As stated above, the "record taken as a whole" standard allows for less than strict compliance with the statutory requirements for establishing a public road. *Reid*, 192 Mont. at 235-36, 627 P.2d at 1213. Consequently, the determination whether a road was created by petition requires a district court to make factual findings—that we review for clear error—and then apply the "record taken as a

9

whole" legal standard to those findings—a conclusion of law that we review for correctness.

¶17    Letica and McGee generally contend that the court failed to consider adequately the record as a whole in determining that the lower branch of Modesty Creek Road is a public road created by petition.  They first argue that the June 1889 Commission declaration contains a "condition precedent" to the road's creation because of its "provision that all parties interested or benefited by said road bear all expense connected with the opening and building of the same."  Deer Lodge County Commissioners Records, *Deer Lodge County Commission Meeting Minutes, June 3, 1889*, Book 6, 396. Letica and McGee assert that the court erred by concluding that the lower branch is a county road created by petition without finding that the county satisfied the condition. They next contend that under the "record taken as a whole" standard, "the record" must focus on county records.  Therefore, they claim that the District Court failed to consider adequately the whole record because the "county-created evidence" alone is insufficient to show the creation of a county road.  Moreover, they contend that the "county-created evidence" shows that the County did not recognize the lower branch as a county road for nearly 100 years.  Finally, Letica and McGee assert that even if Modesty Creek Road's lower branch is a county road, the record as a whole establishes that it must end on the Launderville parcel in the eastern portion of Section 23, Township 6 North, Range 11 West.

¶18    Letica's and McGee's assertion that the court had to find the June 1889 Commission declaration's "condition precedent" satisfied in order to conclude that a

10

county road exists on the lower branch is misplaced. Letica and McGee correctly point out that the road-creation statutes in effect at the time authorized a county to require the payment of "expense and damages" by the road's petitioners. Compiled Statutes of Mont., 5th Div. Gen. Laws § 1819 (1887). Letica's and McGee's argument, however, does not properly apply the standard we set forth in *Reid*.

¶19    *Reid* rejected a standard of strict compliance with statutory procedures where the applicable documentation might be over 100 years old due to the potential burden on the public to produce the jurisdictional record. *Reid*, 192 Mont. at 236, 627 P.2d at 1213. Here, requiring proof of strict compliance with the declaration's claimed "condition precedent" would allow Letica and McGee "to keep the public from going through land because the public's records of a road no longer support a determination that the public had originally acquired jurisdiction to create the road." *Reid*, 192 Mont. at 236, 627 P.2d at 1213. Such a requirement "may well be unsurmountable" and is therefore not required under the "record taken as a whole" standard. *Reid*, 192 Mont. at 236, 627 P.2d at 1213.

¶20    We have considered in prior cases numerous statutory conditions of road creation for which evidence was lacking, and have not found the failure to satisfy one or more particular conditions to be determinative. *E.g.*, *Reid*, 192 Mont. at 233, 627 P.2d at 1210 (noting that the record undisputedly lacked copies of the petition showing a description of the road, that the petition was signed by ten qualified petitioners, and that the commissioners gave notice to the affected landowners); *Lee v. Musselshell Cnty.*, 2004 MT 64, ¶ 16, 320 Mont. 294, 87 P.3d 423 (no records available, other than corrected survey notes, demonstrating that the statutory procedures necessary to alter a road were

11

followed); *Jefferson Cnty.*, ¶ 29 (county conceded that a road's creation was procedurally deficient). Additionally, but for evidence of the "expense and damages" payment, the record demonstrates that the lower branch was created in substantial compliance with the statutory procedures for establishing a county road. Statutes of Mont., 5th Div. Gen. Laws §§ 1809-1818 (1887). The provision requiring payment of "expense and damages" is not qualitatively different from the conditions lacking in those cases, and we conclude that it too is not determinative. Finally, the lack of proof showing payment of expenses could just as well be evidence that the road declaration did not result in any expenses, particularly because there was evidence that the road already existed.

¶21 Letica's and McGee's contention that the record, taken as a whole, cannot establish the creation of a county road on the lower branch due to the lack of "county-created evidence" is unpersuasive because the "record taken as a whole" is not limited to the "four corners" of the public record. *Sayers*, ¶¶ 24, 28. In neither *Reid* nor its progeny have we required that a district court consider only county records under the "record taken as whole" standard. *E.g.*, *Galassi*, ¶¶ 10, 19 (relying in part on the testimony of three witnesses regarding the road's location and its use by the public to conclude that the record taken as a whole established a public road); *Jefferson Cnty.*, ¶¶ 34-35 (relying in part on a private deed of sale, a non-county map, and testimony of witnesses to conclude that the record taken as a whole established a public road); *Lee*, ¶¶ 15, 17 (relying in part on non-county maps to conclude that the record taken as a whole established a public road). Moreover, applying Letica's and McGee's "county-created evidence" standard goes directly against our decision in *Reid* because it

12

would "impose[] an unrealistic burden on the public to prove *on the face of the record* that its public officials had jurisdiction to create a public road." *Reid*, 192 Mont. at 234, 627 P.2d at 1212 (emphasis added).

¶22    Letica's and McGee's parallel assertion that the court erred by failing to consider that the County did not recognize the lower branch as a county road in county records likewise is unpersuasive.  Letica and McGee concede that the County recognized Modesty Creek Road as a county road on the 1896 County road map, but claim that a 1913 County road map showing no county road in the area proves that the County did not recognize Modesty Creek Road as a county road.[7]  Letica and McGee have offered no legal authority suggesting that a county's failure to depict a road as a public road on county road maps means the road is not public.  In fact, we rejected a similar argument in *Galassi*.  *Galassi*, ¶¶ 9, 19 (concluding that the road in question was a public road even though the road did not appear in the county tract book depicting county roads).  Moreover, Letica's and McGee's own expert testified at trial that there could be county roads that are not shown on county maps.

¶23    Additionally, if recognizing a road on county maps was determinative of whether a county established a road by petition, the County's recognition of the lower branch on the 1896 map would end the discussion because "once a road is established as a public roadway . . . a county must take affirmative steps to indicate intention to abandon such road."  *Galassi*, ¶ 15 (citing *McCauley v. Thompson-Nistler*, 2000 MT 215, ¶ 31, 301

_____

[7] Letica and McGee argue that the District Court's findings are clearly erroneous because it failed even to address the 1913 map.  But the court's finding # 58 expressly acknowledged the maps in evidence that do not show the road.

13

Mont. 81, 10 P.3d 794). Later county maps that do not depict Modesty Creek Road do not amount to conduct "so decisive and conclusive as to indicate a clear intent to abandon." *Baertsch v. Cnty. of Lewis & Clark*, 256 Mont. 114, 122, 845 P.2d 106, 111 (1992) (citation omitted) (concluding that the conduct necessary to demonstrate an intent to abandon "must be some affirmative official act, and not mere implication").

¶24 We conclude, after reviewing the record, that the District Court properly considered all of the evidence in determining the make-up of the record as a whole. Therefore, Letica's and McGee's contentions that the court failed to consider adequately the record as a whole are unconvincing.

¶25 After reviewing the record, we further conclude that the District Court appropriately relied on *Reid* and its progeny in determining that the record in this case, taken as a whole, establishes that the County created Modesty Creek Road's lower branch by petition. The March and June 1889 Commission meeting minutes establish that the statutory requirements for creating a road by petition largely were met. The minutes demonstrate that residents submitted a petition to the County Commission; the petitioners posted public notice of the petition; the Commission appointed road viewers to mark out the road; the viewers reported back to the Commission; the Commission accepted the road viewers' report; and the Commission accepted and declared the road as public, thereby providing notice of the road's opening.

¶26 Moreover, the rest of the record contains a wide range of evidence that is sufficient to support the court's determination. The record includes other historical county records such as the 1896 County road map showing the lower branch as a county

14

road, January 1896 Commission meeting minutes approving the map's creation, and an historical undated map found in the County's road record book showing a portion of Modesty Creek Road. The record also includes other maps and surveys showing Modesty Creek Road, including: mining survey maps, homestead entry maps, U.S. Government Land Office maps, Forest Service maps, and County maps. A number of disinterested witnesses testified concerning the County's exercise of jurisdiction over the lower branch and the public's regular use of the road. Finally, the record contains additional documents describing mining activity in the area that would have necessitated a road running along Modesty Creek.

¶27 Letica's and McGee's assertion that the court did not adequately consider maps that do not depict Modesty Creek Road does not render the findings clearly erroneous because our review of the record indicates that the District Court did not misapprehend the effect of the evidence or make a clear mistake. The court specifically found that Letica's and McGee's own expert "agreed that just because a road is not on a county map does not mean that there is no county road in that location." Moreover, even when there is contradictory evidence, "we will uphold the district court if there is substantial credible evidence to support its findings." *Galassi*, ¶ 16 (citing *Jefferson Cnty.*, ¶ 31). The District Court recounted the evidence in detail, and we hold that there is substantial credible evidence to support its findings. In light of the facts as found by the District Court, the court correctly applied the "record taken as a whole" standard in concluding that Modesty Creek Road's lower branch is a county road created by petition.

15

¶28 Letica's and McGee's remaining contention is that even if the lower branch is a statutorily created county road, the record as a whole demonstrates that it must terminate in the eastern portion of Section 23, Township 6 North, Range 11 West. Pursuant to the March 1889 Commission meeting minutes, the lower branch ends "as near as practicable to the mouth of Dry Gulch." Deer Lodge County Commissioners Records, *Deer Lodge County Commission Meeting Minutes, March 21, 1889*, Book 6, 373. The parties disagree about Dry Gulch's location.

¶29 Letica and McGee again assert that there is not any "county-created evidence" showing that the lower branch extends beyond the eastern edge of Section 23—relying in particular on the 1896 County road map. Their reliance on the 1896 County road map is misplaced because, as the District Court found, Township 6 North, Range 11 West on the map is "unsurveyed" and therefore does not depict the particular section(s) where Dry Gulch is located.[8]



---

[8] The map shown is a portion of the 1896 County road map included in the record.

¶30 In determining Dry Gulch's location, and consequently the lower branch's terminus, the District Court considered testimony from longtime area residents regarding their understanding of Dry Gulch's location, historical maps depicting Dry Gulch, and historical documents describing Dry Gulch. Moreover, the court conducted a judicial site visit that confirmed historical placer digging in the gulch found by the court to be Dry Gulch in Section 22, Township 6 North, Range 11 West. This historical placer digging evidence corresponds to Dry Gulch's description in the historical documents the court analyzed. The court further found that Ken Jenkins' testimony regarding Dry Gulch's location lacked "reliability and credibility."

¶31 After reviewing the record, we conclude that the court's findings establishing Dry Gulch's location along the eastern portion of Section 22, Township 6 North, Range 11 West, are supported by substantial credible evidence. The court therefore correctly applied the "record taken as a whole" standard in concluding that the lower branch terminates along the eastern edge of Section 22, Township 6 North, Range 11 West.

¶32 Accordingly, we affirm the District Court's conclusions as to Modesty Creek Road's lower branch.

¶33 *2. Whether the District Court erred in concluding that the public holds a prescriptive easement across Modesty Creek Road's upper branch.*

¶34 The District Court determined that there is a public prescriptive easement on Modesty Creek Road's upper branch. Letica and McGee argue that this holding was in error and that, even if the County proved a prescriptive easement on the upper branch, it was extinguished by reverse adverse possession. Because we find the latter argument

17

dispositive, we assume for purposes of analysis that the District Court correctly found that a public prescriptive easement had been established.

¶35 Reverse adverse possession may extinguish a public prescriptive easement on a private road. *Pub. Lands Access Ass'n, Inc. v. Boone & Crockett Club Found., Inc.*, 259 Mont. 279, 856 P.2d 525 (1993) (hereafter *Boone & Crockett*); *Dome Mt. Ranch, LLC, v. Park Cnty.*, 2001 MT 289, 307 Mont. 420, 37 P.3d 710. Under § 70-17-111(1)(c), MCA, a servitude may be extinguished "by the performance of any act upon either tenement by the owner of the servitude or with the owner's assent that is incompatible with its nature or exercise." Based upon that statutory language, we have held that "if a prescriptive easement exists, subsequent acts inconsistent with the claim by prescription[ ] support the conclusion that the prescriptive easement has been extinguished." *Boone & Crockett*, 259 Mont. at 290, 856 P.2d at 532 (citations omitted) (construing § 70-17-111(3), MCA (amended and codified at § 70-17-111(1)(c), MCA; 2007 Mont. Laws 352)). Acts that are inconsistent with the public's claim by prescription are assertions of hostile rights that "must be brought to the attention of the owner [the public] and the use must continue for the full prescriptive period." *Boone & Crockett*, 259 Mont. at 290, 856 P.2d at 531 (citation omitted). The prescriptive period is five years. Sections 70-19-404, to -405, MCA.

¶36 In considering whether reverse adverse possession extinguished the public prescriptive easement on the upper branch, the District Court correctly observed that "a private individual may not obtain title to a public statutorily created road by adverse possession." *McCauley*, ¶ 33 (citation omitted) (stating that "Montana has followed the

18

general rule that title to public roads may not be obtained by adverse possession"). Based on the lower branch's status as a statutorily created road, the court determined that it would be against public policy to allow Letica and McGee to extinguish the public prescriptive easement on the upper branch by blocking the lower branch. Applying our precedent to the historic record of Modesty Creek Road, we conclude that the status of the lower branch is not relevant to the analysis of whether reverse adverse possession extinguished the public prescriptive easement on the upper branch and we therefore disagree.

¶37 In *Boone & Crockett*, a landowner closed the road in question to through traffic by installing locked gates. *Boone & Crockett*, 259 Mont. at 288, 856 P.2d at 530. The landowner subsequently created a walk-in program allowing public access to public land beyond his property. *Boone & Crockett*, 259 Mont. at 289-90, 856 P.2d at 530-31. Anyone who wanted to drive the road beyond the walk-in point had to get landowner permission. *Boone & Crockett*, 259 Mont. at 288-89, 856 P.2d at 530-31. We concluded that these actions "evidenced a 'distinct and positive assertion of a hostile right'" to the public's claimed prescriptive easement. *Boone & Crockett*, 259 Mont. at 290, 856 P.2d at 531 (quoting *Taylor v Petranek*, 173 Mont. 433, 438, 568 P.2d 120, 123 (1977)). The landowner, we reasoned, "established reverse adverse possession because the state and local government, as well as the public[,] cooperated and adhered to the walk-in policy which had been in existence for approximately 17 years." *Boone & Crockett*, 259 Mont. at 290, 856 P.2d at 532. We held that such compliance with the road access restrictions "was inconsistent with the claim of a public prescriptive easement. Accordingly, any

19

prescriptive easement the public may have acquired in the road was lost." *Boone & Crockett*, 259 Mont. at 291, 856 P.2d at 532.

¶38 In *Dome Mountain Ranch*, the Park County Commissioners declared the subject road a public road for the first time in 1994 after the public requested that the road be opened as a county road. *Dome Mt. Ranch, LLC*, ¶ 8. A previous landowner, however, had placed gates across the road in 1965 that often were locked. *Dome Mt. Ranch, LLC*, ¶ 6. The locked gates remained until 1998. *Dome Mt. Ranch, LLC*, ¶ 24. The record further established that "although members of the public occasionally used the road . . . after gates and no trespassing signs were erected, such use was for recreational purposes." *Dome Mt. Ranch, LLC*, ¶ 24. We concluded that "Park County and the public's acquiescence of locked gates being place[d] thereon for approximately 30 years extinguished Park County's public prescriptive easement, if one existed, on the subject road." *Dome Mt. Ranch, LLC*, ¶ 25.

¶39 Here, similar to *Boone & Crockett* and *Dome Mountain Ranch*, the record includes substantial evidence that locked gates on the lower branch blocked public access to the upper branch from 1980 until 2012. At trial, Letica's predecessor in interest, Cal Christian, testified that he installed and locked the green gate on the lower branch in 1980 after witnessing a number of vehicles on the property during hunting season. He also testified that the orange gate was installed and locked in the early 1980s. Cal's son Clayton Christian, who worked at the property, testified that the family placed ads in the paper to let the public know that they were restricting access to the property. Moreover, Cal Christian testified that the County never complained to him about the gates'

20

placement and that the gates remained locked when he sold the property to Letica in 1989.

¶40    Launderville, whom Letica employed from 1994 to approximately 2004, testified that the orange and green gates were installed and locked in the early 1980s and remained locked during the time he worked for Letica. He also testified that in the early to mid-1980s, DeMers removed a culvert at the orange gate, further hindering road access because the culvert allowed road users to cross Modesty Creek. The culvert was not replaced until 2002. Launderville testified that during those approximately twenty years he was unaware of anyone traveling that route beyond the orange gate. Ilija Letica testified that both the orange and green gates were locked continuously from the time he bought his property in 1989 until 2012 when the County declared both branches of Modesty Creek Road county roads. He further testified that no one, including the County, requested that the locks on the gates be removed during his ownership of the property.

¶41    Additionally, the vast majority of testimony concerning the public accessing the upper branch came from witnesses who traveled the road prior to the gates' installation in the 1980s. Jim Heaphy, a longtime area resident, testified that he traveled the upper branch to access the lakes on the National Forest beginning in the late 1950s but that he stopped using the road once the gates were locked on the lower branch because he considered it trespassing. Other members of the Heaphy family similarly testified to not traveling the upper branch once the gates were installed but said that they accessed the lakes by Forest Service trails instead. Charles Fudge, a district ranger for the Deer Lodge

21

Ranger District, testified to using the upper branch to inspect dams on the lakes until 1976. Thomas Radonich, a longtime area resident, testified to traveling the upper branch to access the lakes in the 1940s and 1950s.

¶42 Connie Ternes-Daniels, a County Commissioner from 1987 to 1990, testified that she traveled the upper branch in the late 1960s and did not travel up there again until the gates' removal. She further testified that she knew about the gates on the lower branch during her tenure as Commissioner. John Thomson, the County Road Department foreman from 1971 to 1989, testified that he knew about the locked gates but did not take any action to open them. He testified that the issue of the locked gates was "turned over" to the County Commission and that, as far as he knew, no action was taken. He further testified that the gates remained locked when he retired in 1989. Larry Sturm, the County Road Shop supervisor from 1993 to 2014, testified that he knew of the locked gates on Modesty Creek Road but did not take any action to remove them until the County reaffirmed the road as a county road in 2012. In contrast, he testified that he cut a lock off of a cable that McGee put across Spring Gulch Road—an undisputed county road—"as soon as we found out about it."[9] He further testified that he promptly cut locks off of a gate installed by DeMers on Spring Gulch Road when he was "made aware of it."

¶43 Modesty Creek Road's lower branch provides access to the upper branch. Therefore, the installation and locking of the green and orange gates on the lower branch,

---

[9] Sturm testified that McGee put the cable across the road in the springtime when the road was "very, very muddy" in order to keep people from tearing up the road. Sturm removed the cable but did allow McGee to put up signs stating, "road closed due to muddy conditions or something."

22

plus the culvert's removal, restricted public access to the upper branch. Such acts by the various landowners evidence a "distinct and positive assertion of a hostile right" to the public's claimed prescriptive easement on the upper branch. *Boone & Crockett*, 259 Mont. at 290, 856 P.2d at 531. Additionally, the testimony of the various witnesses demonstrates that the County and the public "acquiesce[ed to] locked gates being place[d] thereon for approximately 30 years." *Dome Mt. Ranch, LLC*, ¶ 25.

¶44 Like in *Boone & Crockett*, the public had to get permission to access the upper branch once the landowners installed the gates. At trial, Cal Christian testified that as far as he was aware, the public never came through the green gate without his permission during his ownership of the property. Ilija Letica testified that during his ownership the public did not travel either branch of Modesty Creek Road and that the Forest Service asked for permission to travel the upper branch onto the National Forest. Other witness testimony evidences permissive use of the upper branch by the public following the gates' installation in the 1980s. Dave Beck, whose family had water rights in a lake accessed by the upper branch, testified that his family had a key to the gates in the 1980s to access their water rights. Dan Kelley, who leased the Launderville parcel for grazing, testified that he had a key to the gates and had permission to go through the gates. Gerald Wendt, a former County employee, testified that he got permission from Cal Christian to access the area for trapping and had keys to the gates. Leo Nicholes, a longtime area resident who also had water rights in the lakes, testified that he had a key to the gates in

order to access his water rights by way of the upper branch.[10]  The record demonstrates that for the most part, "the public cooperated and adhered" to the permissive use policy following the gates' installation.  *Boone & Crockett*, 259 Mont. at 290, 856 P.2d at 532.  The public's asking for permission to use the upper branch and not regularly traveling beyond the locked gates to the upper branch without landowner permission is "inconsistent with the claim of a public prescriptive easement" over the upper branch.  *Boone & Crockett*, 259 Mont. at 291, 856 P.2d at 532.

¶45    Although Launderville testified that people sometimes cut fences in order to access the upper branch, occasional public use is not sufficient to conclude that reverse adverse possession did not extinguish the claimed prescriptive easement.  *Dome Mt. Ranch*, ¶¶ 24-25.  Moreover, on cross-examination, Launderville testified that when he worked for Letica he made an effort to prevent people from getting around the gates and accessing the upper branch.  He further testified that a few specific individuals—DeMers and Rich Bowbent—were the principal offenders and that they traveled a route different from the upper branch after cutting the fence in order to access their pasture land on a neighboring section.

¶46    The District Court is correct that a person may not obtain title to a statutorily created road by adverse possession.  But Letica's and McGee's claim to Modesty Creek Road's lower branch—which now has been determined to be a statutory road—does not determine as a matter of law the status of the upper branch—which is not a statutory

---

[10] Many water rights holders testified that they received permission to access their water rights via the upper branch.  Ilija Letica testified that water rights holders would continue to have permissive access to the lakes via the upper branch.

road— on the basis of the record in this case. The District Court premised its conclusion that the prescriptive easement "was not extinguished by reverse adverse possession" on an erroneous determination that "access to the road was never restricted in an adverse way to the public for the statutory period." Installing locked gates that blocked access to the upper branch well in excess of the statutory period, removing the culvert at the orange gate, and requiring permission to access the road beyond the gates all are acts that are incompatible with the nature or exercise of the public's claimed prescriptive easement over the upper branch. Although it ultimately turns out that the gates on the lower branch were blocking a public road, the record demonstrates that for thirty years everyone acquiesced in the understanding that these were private roads, and the owners of the subsequently claimed public prescriptive easement—the public—assented to these assertions of hostile rights by the landowners.

¶47 By declaring the upper branch a county road for the first time in 2012, the County recognized that the landowners had asserted hostile rights for the previous thirty years. In this case, such a declaration "30 years after the . . . gates . . . were in place" is irreconcilable with the County's public prescriptive easement claim. *Dome Mt. Ranch, LLC*, ¶ 25 (noting that the public did not request, and the county did not declare, that the road be opened as a public road until approximately thirty years after gates and "no trespassing" signs were in place). The evidence illustrates that, given the historic understanding of the road's ownership since the Anaconda Company days, this case is not about a landowner intentionally and illegally blocking a public road and then trying to

gain reverse adverse possession.[11] Accordingly, it is not dispositive that the gates were installed on the lower branch. The public policy concern to which the District Court and the Dissent refer is not "at stake in the present case," Dissent ¶ 55, because the Modesty Creek gates were "known to[] and acquiesced in by" the County. *Boone & Crockett*, 259 Mont. at 283, 856 P.2d at 527.

¶48 Moreover, Montana statute provides that a prescriptive easement may be extinguished "by disuse of the servitude by the owner of the servitude for the period prescribed for acquiring title by enjoyment." Section 70-17-111(1)(d), MCA. The period prescribed for acquiring title by enjoyment is five years. Section 70-19-404, MCA. The record establishes that the general public essentially abandoned the upper branch for thirty years by not using it.

¶49 We conclude that the District Court erred in its application of the law regarding reverse adverse possession to the facts existing on the upper branch. The court's conclusions of law therefore are incorrect. Accordingly, we reverse the District Court as to Modesty Creek Road's upper branch.

**CONCLUSION**

¶50 We affirm the District Court's conclusion that Modesty Creek Road's lower branch is a statutorily created public road. We also affirm the court's findings as to the lower branch's terminus. We reverse its conclusion that the public prescriptive easement it found on Modesty Creek Road's upper branch was not extinguished by reverse adverse

---

[11] Nor is this case about blocking access to public land. It is undisputed that the same National Forest land accessible from the upper branch is also accessed by a public road leading to a developed campground nearby.

possession. The case is remanded for entry of an amended judgment consistent with this Opinion and for further consideration of Letica's outstanding bifurcated claim.


/S/ BETH BAKER

We concur:

/S/ LAURIE McKINNON
/S/ PATRICIA COTTER
/S/ JAMES JEREMIAH SHEA
/S/ JIM RICE


Chief Justice McGrath, dissenting.

¶51 I concur in the majority's resolution of Issue 1, that the lower branch of Modesty Creek Road was established as a county road by Anaconda-Deer Lodge County (or its predecessor) according to the requirements of Montana Law.

¶52 I dissent from the majority's resolution of Issue 2 and would uphold the District Court's determination that the public holds a prescriptive easement to travel the upper branch of Modesty Creek Road.

¶53 The District Court determined that there was "compelling evidence" that the lower branch of Modesty Creek Road was a public road, established by Anaconda-Deer Lodge County in 1889. Because it was a county road, the landowners were not able to establish prescriptive rights over the road as a matter of law. *McCauley v. Thompson-Nistler*, 2000 MT 215, ¶ 33, 301 Mont. 81, 10 P.3d 794. The District Court further determined that there was no evidence that the landowners in this case "took any legal steps before

27

locking the orange gate and blocking access" to the lower branch road and had no legal right to do so.

¶54 Under these circumstances the District Court determined that it would violate public policy to allow Letica to extinguish a public prescriptive easement over the upper branch road by illegally closing the lower branch road. As the District Court stated:

> Thus, it would be improper for this Court to adopt a policy that allows an individual to illegally block a public statutorily created road (the lower branch road) and claim that the public prescriptive easement (over the upper branch road that branches off the lower branch road nearly a mile down from the orange gate) is extinguished by reverse adverse possession. Such a holding would be against public policy.

¶55 The majority disagrees with the District Court, citing *Boone and Crockett* and *Dome Mountain Ranch*. Those cases hold that a public prescriptive right to travel a road (as opposed to a road established and owned by a public entity) may be taken by reverse adverse possession. However, neither case considers the public policy issue at stake in the present case.

¶56 The majority concludes that "the status of the lower branch is not relevant to the analysis of whether reverse adverse possession extinguished the public prescriptive easement on the upper branch. . . . ." Opinion, ¶ 36. To the contrary, but for the illegal gates installed across the county road on the lower branch, there was no barrier or impediment to public use of its prescriptive easement on the upper branch road. This case would not exist but for the unlawful closure of the lower branch road.

¶57 I would uphold the District Court and conclude that a person may not illegally block a road created by action of a public governmental entity, and then use that blockage

28

as evidence to support a claim of reverse adverse possession that extinguishes the public's prescriptive right to any other property or interest in property.

¶58    I dissent.

/S/ MIKE McGRATH

Justice Michael E Wheat joins the Dissent of Chief Justice Mike McGrath.

/S/ MICHAEL E WHEAT